Hearing hearing hearing the United States Court of Appeals for the 11th Circuit is now open according to law. God said the United States in this honorable court. Good morning. We have only one appeal to hear this morning. Uh, council, uh, we're familiar with your cases, your case. And so, uh, we've read your briefs, your authorities, portions of the record. So you don't have a lot of time this morning. Get straight to the heart of your argument. You don't, you do not need to familiarize us with the background of your case. We know about it. Um, we're probably going to have some questions, but be mindful of the clock. And, um, when your time expires, please, um, wrap it up. If you're answering a question from the court, of course, you can finish your answer, but do be mindful of the clock and you won't lose any rebuttal time if, if you have rebuttal time. Uh, our only case this morning is United States versus Moss. Um, Mr Garland. Good morning, your honors. John Garland on behalf of Dr Moss subject to your honors questions. I'll focus on two issues. First, the district court's quashing of the subpoena to Miles Hannon, the lawyer for the government's witness, Sean Taiwan. And second, the district court, Sue Esponte, cutting off my father during closing argument and preventing him from arguing the government failed to prove Dr Moss made a profit coupled with the district court's erroneous jury instruction that profit was not relevant. Turning first to the district court's erroneous quashing of the subpoena. The district court aired every step of the way in both its analysis and ruling first by  concluding that Dr Moss did not establish that Sean Taiwan's waiver of the attorney client privilege was intentional and not otherwise inadvertent under Rule 502. Had had the district court place the burden of proving that privilege applied on Taiwan as the law requires, Taiwan would have been unable to meet that burden. What difference would it have made? Didn't the attorney for Taiwan back up what he said in the in chambers examination? If I'm understanding your question correctly, you're asking, did Taiwan country? Did Taiwan's lawyer contradict Taiwan? Is that your question? Your honor? Yeah. Okay. Well, actually, it's it's more would he have based on what he told judge? Yes. Yes, your honor. Um, there in fact was a direct contradiction between Taiwan and his lawyer, and it's shown by the testimony of Taiwan Taiwan in line with what he previously told the government testified. My attorney told me not to volunteer that until it was asked or not to reveal that until I was asked in this quoted testimony that that Taiwan referred to was the cash payments from Dr Moss. On the other hand, isn't that exactly what the attorney said? No, your honor. On the other hand, miles hand. And had he been had he been allowed to testify, would have testified in line with what he said in his proffer where he contradicted the claims of his client. My father asked him and you had not, as you just stated, informed Taiwan that he should conceal from the government, the court and during his entry of his guilty plea or throughout his plea negotiations. The cat's not that's not inconsistent. He didn't tell him to conceal. He he directed his testimony was, at least in in chambers was his testimony was going to be that. I told him not to volunteer anything. If you ask answer, yeah. Yeah, that's not concealing. I mean, I'm sorry. Maybe I was wrong for all my years of prepping witnesses, but I always tell not to volunteer anything. Right. I say don't volunteer anything unless it's helpful to my side of the case. But telling somebody I have something a little more fundamental. I want to back up a little bit. I tend to agree with with my colleague, but I want to go to what was actually asked and whether it would be impeaching. So this goes to the harmlessness issue, the same issue that that Judge Carnes is asking about. As I understand it, the question that was asked of Mr. Taiwan or tie on at the trial was I want to know exactly what you said when you were justifying having lied about the money about your attorney and his contract. And the answer was when they, meaning the U. S. Attorney's office or the U. S. Attorney asked, they said, Why didn't you tell us sooner? And I said, My attorney told me not to volunteer that until it was asked or not to reveal that until I was asked. And then that inquiry ended, right? That that's the that's the issue. And the question is, you want to impeach that, right? Yes, Your Honor. Okay, so how can you impeach what he testified that he told the U. S. Attorney's office about what his attorney said when his attorney was not there to impeach that testimony. In other words, the question was not what advice did your attorney give you that I could understand? Maybe impeached, although subject to what Judge Carnes asked you about. But the question that was asked to impeach him was not what advice did your attorney give you? It was what did you tell the government? And he said, I told the government X. His attorney wasn't in the room to contradict what he told the government. The case agent might be able to contradict that. Maybe one of the U. S. who was not present on that day could contradict that testimony. Your Honor, he can't contradict the testimony that as to what he said to the agents. But he can very much contradict the idea, the concept that what he said to the agents was true. He could directly prove by independent evidence. But he was never asked that question. In fact, in the lead up to all of this, the trial judge said, Why do you need this? And and the attorney, the trial attorney told the trial judge said, said, Judge, listen, here's what I'm gonna do. I'm gonna ask him. What did your attorney tell you? And was that a lie? And if he says it's not a lie, then I'm gonna call the attorney. If he says it's a lie, then I don't need to call the attorney, and we don't need a rule in the subpoena. But when it came time to ask him the question, no one ever asked him. What did your attorney tell you? The question that was asked is, What did you tell the U. S. Attorney's office? And then he was without those questions. What is there to impeach? Well, Your Honor, I believe Your Honor is splitting too fine of a hair here because first turning to the issue of whether you mean by actually reading the transcript? No, Your Honor, because the fundamental issue of Taiwan claiming that his lawyer instructed him to not reveal this information came out through the testimony of Taiwan, and we needed to rebut that. But it didn't come out. What what at what was asked is what did you tell the U. S. Attorney's office? Not what advice did your attorney give you? And I would submit your honor that regardless of the form in which it came out, the issue came across to the jury that he did not reveal the cash because he was instructed by his lawyer not to reveal it unless asked. Can I ask you the closing argument question? Because I want to make sure you have time for that. Also, yes. Um, so as I understand the closing argument, the effect, the quote offending portion. What was said was quote that, uh, that he had all these expenses out of his business bank account. He was paying out all this money, and this money was earned by paying a quarter of a million. That's just the beginning. He had to pay for all these other things. And then there and there's no proof. Not one bit of proof. And they had a duty to prove it beyond a reasonable doubt. They don't prove it. You acquit. That is wrong, right? That's legally wrong to tell the jury that they could acquit where there was more expenses than there was revenue coming in. Wouldn't it's long to say they had a duty to acquit. I would disagree that they could acquit based on that. The issue is they have the statement to the jury was they have a duty to prove it being profit beyond a reasonable doubt. They don't prove it. You acquit. That is legally wrong. Correct, Your wrong to jump in at that point and say, Hey, jury, that's not the law. He doesn't have to show profit as part of the duty here. And I instruct you of that. How is that wrong, Your Honor? Because that's not what the trial court did. The trial court jumped in and said that profit is is not an issue in this case, and it's not the crime, but but that is not at all what the court said. And it's ruling nor nor setting aside that portion was the overall purpose of the argument was to establish the government's failure to prove profit and profit is as established by the president of the court is highly morally jumped in. The problem is that the court only jumped in after whoever made the argument crossed that line to not just that they didn't prove it. I think if that was where it was left, this would be a different issue. But then they said they have a duty to prove it beyond a reasonable doubt, which is not true. And they don't. If they don't prove it, you have to acquit. That is not true. Yes, Your Honor. That is correct. I agree with you. But we have to focus on what the court said to the jury in the court. Then said, I ruled once that if the defendant made a profit or not in his medical practice was not an issue in this case, it's not an element. And that's an improper argument to argue that it is an element of the crime. And I instruct that to the jury, right? No, I don't believe that he used the word element. You're on. He didn't use the word issue. But how? How are we to read that? Anything other than the context where it comes in, where it was argued that you have to prove profit. The government has to prove profit beyond a reasonable doubt. And if they don't, you have to acquit because we read as he we're raising the government's failure to prove a relevant issue, which is motive. And he motive may be relevant, but it's not a relevant issue. It's not an issue. If the judge had said, if you find the government failed to prove that the defendant had a motive to do commit fraud, they don't know what his motive was. If any, that'd be wrong, wouldn't it? I'm sorry. I just didn't understand. You find a motive. How many times have we said motive is not an element doesn't have to be proven, but it's relevant. And your honor is absolutely right. It's not an element, but we're entitled to argue relevant issues, but you're not entitled to tell the jury that the government has an obligation to prove it. That is correct. Your honor. Absolutely. That's what the district court was trying to deal with. I want to go back to Taiwan's testimony for a moment of it. Okay. Once you just really trying to prove that Taiwan was a liar. No, this was not at all general credibility impeachment, your honor. This was a very specific step we were taking. We were showing specifically that when Taiwan, your honor, Mr Garland, I got to jump in there because I know when you're brief, you try to now say that it's to establish an M. O. That that was what he did when he was confronted with a lie. I, I get that's what you're trying to do now, but let's look at what you actually told the district court judge because I'm looking at page 1 96 of docket entry 1 42 right before this whole thing came to pass. And the court says very clearly, if you call Mr Hannan, what would the purpose of calling him be? And, and the attorney, the trial attorney says, quote, to impeach the testimony delivered across examination to show it's a lie. That's it. It was to impeach the testimony on cross, not to establish a motive apparandi for Taiwan response. If you go to the response to the motion to quash, it is unbelievably consistent with that. It says that we want to under 608 B, uh, prove quote, Tyrone's lies are quintessential type of deception that the jury must consider in evaluating his credibility. This was about impeachment, not about a motive apparandi, right? This is about character for untruthfulness, isn't it? And so I've got multiple questions here, but this, the impeachment was a necessary step in establishing the motorist modus operandi. And as I attempted to argue in my closing, but without the underlying proof that that that it occurred that we had not been able to establish the motive operandi, I would submit this is not an after the fact because I in fact tried to argue it in my closing, even without the underlying proof. So the argument fell flat and no, it is not general credibility impeachment because it goes to establishing this specific pattern. You're on. Okay. Um, do we have any other questions? Um, I hope I'm pronouncing this correctly. Isn't this test here? Yes, that's correct. Um, may I please report canola test here on behalf of the United States? Um, council, if we can, I want to give you an opportunity to respond to the things that that you're opposing council said, but I have some issues with the sentencing that I want to talk to you about. Yes, your honor. And then if we can circle back, if we have enough time, I'd like for you to respond if you need to. Um, first, regarding the loss amount calculation, as I understand it in a health care fraud case, what the commentary to the guidelines essentially say is, you know, intent intended loss is obviously generally going to be more than an actual loss. And the way we calculated for health care fraud is that we treat as prima facie evidence the amount that was billed if not rebutted, right? That's correct. Okay. Here is I understand the evidence that was presented to the court for both trial and sentencing. You have a P. S. I. Which says that the defendant closely monitored his billing practices a P. S. I. Which says that he was very familiar with the rules and practices of health care fraud. You have the manager of the third party billing company that left him in 2011, stating that he was more interested than any other doctor in codes and associated reimbursement, and he was very savvy about this. You have the P. A. The cooperating witness who testified that he knew what the private insurance reimbursement rates were for Medicare and Medicaid. He was he knew how much money than the level each level of service would be and how much money for that level of service. He knew because the bank he controlled the bank accounts how much money was coming in, and his employees all said that he closely monitored the billing. And in fact, the government's entire theory here is that he manipulated the codes to increase the amount of money for reimbursement. That's the whole theory of the fraud. How is that not at least rebutted the presumption that the build amount was the amount that this particular defendant intended? That's my question. Um, certainly your honor. Um, and I can't imagine a case in which a district court might find within its discretion that evidence of the enough evidence of the doctor's knowledge of reimbursement of reimbursement codes did rebut it. But this is I'm not aware of any case holding that a district court is required to find that the presumption has been rebutted. That's certainly true, and the intended the loss amount is reviewed for clear Show me the evidence that supports the opposite inference. Show me the evidence in the record that supports the opposite inference that this defendant intended that the build amount would be everything that he was going to collect. Um, well, I would just clarify that the prima facie case itself establishes that the intended loss is the build amount agreed and assume for the moment, and I'm only speaking for myself that the evidence I You're right, though, that we review that for clear error. The ultimate conclusion. So I'm asking what evidence is there in the record which supports the ultimate conclusion? Well, I think that the district court could reasonably infer that the defendant intended or hoped to be paid more than the given reimbursement rate at any given point in time. Was there some evidence that reimbursement rates increase periodically, sometimes more than annually? Yes, that's correct, Your Honor. So at district docket entry 1 85 page 1 26, there was evidence that the rates changed almost annually and sometimes more than annually. And so, of course, there's some reason why doctors bill more than the reimbursement rate. The question is, why do they bill more than the reimbursement rate? And what can the court and how does the reimbursement rate changing mean that he hoped to the intended amount? In other words, if he followed the reimbursement rates and he was building based on the fact that something's got more money than others, then how is the fact that the rates changed affect the distinction that he intended one thing and that he intended the amount being different than than the bill amount? My understanding is that you get paid the greater of the build amount or the reimbursement amount. And so if you bill less than the reimbursement amount, then you're not getting paid the full reimbursement amount. So if you bill if you bill $100 and the reimbursement rate changes from $100 to $110, you only get paid $100. So one of the reasons to bill more than the reimbursement rate is so that when the reimbursement rate changes, you can get the higher reimbursement rate. Now, there to be clear, there's some inferences required there because the evidence in the record is primarily that the reimbursement rates did, in But I point the court to and I realize it's not precedent from this circuit, but the four circuits case in Miller explains that the reason why you infer that the build amount is the intended loss is because for 100 years, the courts have recognized that the purpose of a bill is to tell the pay the payor how much you think that you should be paid. And that's the inference that the court is making, except except in the crazy world of government where no one actually expects the amount that you build to be what you what government actually pays out. But I get that that's the prime official evidence. And I think for an unsophisticated party, that works. But I just what let me ask you this, what other evidence other than the reimbursement rates changing, would support the inference or evidence that the doctor intended the build amount to be the amount of reimbursement? I think that the cases that defense counsel sites in their case actually present exactly that kind of evidence. So they cite Moran and Semra. And in Moran, I believe it was a projected revenue documents that came from the doctor's practice that showed that he in fact expected to be paid the build amounts. And there's no evidence of projected revenue here. And then somehow it was testimony from the defendant to the effect that he only ever intended to be paid the reimbursement amounts. So it's actually could be quite easy for a doctor to re to rebut the presumption by, for example, submitting an affidavit saying, well, I know that I build $100. But I it appears to me as if he did, but wrote the resumption. And it's clear that you can do it based on evidence of trial. This is the question that for you is not whether the presumption has been rebutted, but whether there is evidence in the record supporting the district court's ultimate conclusion, finding that the rebuttal that there is other evidence supporting the intended loss amount being the actual loss amount. So you pointed to the reimbursement rates changing. What other evidence is there in this record? Well, I think the reimbursement rates changing is the best evidence. Is it the only evidence? Is there anything else that you could point to? Well, I think the court can not specific evidence, but I think the court can rely on the inferences from why someone would bill more than the reimbursement amount. The question of why would they do that? And I think the Miller case explains that when you bill something, you are communicating that that's what you intend to be paid. I would just if I would just let me ask you a question about this. That cuts both ways, doesn't it? If you more than you know, under the you're going to get are entitled to get. Why doesn't that just show you're covering yourself in case the reimbursement rates go up the Monday after you send the bill in on Wednesday? Well, I think that's right, which is why that's the intended loss. And that's why I mean, I think it's very important here that the guidelines does say that the bills amount in and it's particular to health care fraud cases. So in the in the context of health care fraud cases where it is common knowledge that Medicare often will pay less than an individual's bill, that is the presumption that the guidelines has put in place in Medicare cases. So it's with the knowledge that in most instances people understand that reimbursement rates are lower and the guidelines still places that prima facie still says that build amount is prima facie evidence of intended loss. And there is a difference. Yes, let me make sure of this. You're not arguing that under the regs are the rates of that particular day, he's entitled to be reimbursed for a bit of a performed service of $100. And he sends in 200. You're not saying that's the intended loss. 200. You're saying 100 is lost, correct? No, no, Your Honor. We're saying that the guidelines instructs courts that the that the intended loss is to be based on the build amount unless the defendant rebuts the presumption. And the question is, what does it take to rebut the presumption? All right, let me let me ask you this. Suppose you've got a doctor who actually performs a service and he's entitled under the reimbursement to get $100. But he bills for $200 and they only pay him $100. Is that an intended loss on his part? Assuming it's a crime somehow some way is that ended loss on his part of $200. The guidelines instruct that the intended loss in that case is $200. Unless the defendant, the problem with that is and we got a blurry line here between judicial notice and what we all get through the mail periodically, particularly as we incur more health costs. They always bill more, always bill more than they're due to be reimbursed. District Court here did judicially notice that everybody knows that thing, right? I'm I think the district court may have mentioned it. I'm not sure if he specifically didn't say everybody knows that you get exactly what Judge Barnes just said, which is you bill more and you get less. That's right. And I think it's important that the guidelines commentary still says in those facts. And again, I think it's important that the guidelines commentary is specific to health care fraud cases. All right. I want to ask about the forfeiture if I can. I'm not finished with this. This is so there's most didn't produce any direct evidence of his intended amount to be paid, did he? So what we really have here is that he has a general knowledge of that. He has a even sophisticated knowledge of reimbursement rates, but there's but but he didn't offer any evidence that he only wanted to be paid that amount. Did he? That's correct, Your Honor. He did not produce any evidence as the defendants did in Moran, and there was evidence that and there was evidence that the reimbursement rates increase. And it could be that, depending on the amount of increase, you would get paid more than what the reimbursement rate had been. But it would only be up to the build amount, right? That that is correct, Your Honor. There was evidence as to the increasing amounts. And and this is a point that I think Judge Luck and the district court only gave him 90% of the build amount as the intended loss. That's correct. That's correct, Your Honor. All right. I just want to make sure I understood. That's correct, Your Honor. And and I would note, I think that it's not that the district court found here that the presumption had been rebutted and that the government had come back and shown additional evidence of greater loss. But what the district court found was that the presumption had not been rebutted. And the reason the district court found the presumption had not been rebutted is because the last calculation that the defendant produced a trial was entirely our sorry, it's sentencing was entirely erroneous. It didn't start from the build amount at all. What it did was it assumed how many visits Dr Moss's that went council that went to a different issue that went to the whether the services were legitimate or not, not the intent of when he sent the bills or not. That's a different issue. Well, it's the defendants. I think it's important that the defendant's alternate loss calculation was faulty and it is part of the overall defendant's lack of rebutting the presumptions that were properly applied. The problem is that those are just different issues. I agree with you that the evidence clearly supported 10% versus what the what the defendant proffered. I think there were two alternate calculations and the court chose one. I don't see an issue with that, but I do want to talk to you about that with regard to forfeiture. Chief, is it okay if I ask him after? Okay. Um, the forfeiture statute says that, uh, that we that property shall be forfeited if it constitutes or derives from gross proceeds traceable to the commission of the offense. If the district court found and I tend to agree that there was evidence supporting that finding, and at least by a preponderance that 10% of the traceable to health care fraud. Then why does that discount not apply to the forfeiture amount in the same way that you discounted the loss amount and the restitution? Well, I'm I'm not sure that the district court found that 10% of the proceeds were legit were not traceable to the fraud. Well, it didn't make that finding, but it did find that those were part of legitimate services, which is why it discounted both the loss amount and the restitution amount, right? So they may have been legitimate services and that Medicare would have paid for them. Well, that is not traceable to the commission of the offense if they're for legitimate services that would have been paid. No. So I so I point the court to the district, the D. C. Circuit case in Bikundi. Okay. Okay. In that case, the Bikundi case that case, though, every billing was fraud because of the way that that fraud was done. So every billing was subject to some sort of fraud. And I agree. I think the D. C. Circuit got it exactly right. But if the district court's finding here is that at least 10% of the bills were legitimate, meaning not subject to any sort of fraud, then why would that not fall within the not traceable to the commission of the offense? And I think that's where we disagree. I don't think the district court found that 10% of the bills were legitimate. I think the services may have been compensable, and that's different. Every single if the total if the build amount is he was two point something million was the build amount, and 90% of that was fraud. But 10% of it was actual legit services that word fact provided and would have been otherwise compensable other Medicare under Medicare. How can we say that that's traceable to the commission of fraud? Because the even the services that were so that so the 10% comes from Taiwan's testimony that 95% of the services there was nothing and the nurse and the nurse practitioner who also provided some services. It was both. That's correct. And the nurse practitioner. Um, and but each of those so every single one of the nurse practitioner services with build under Dr Moss's name. So every single one of those bills was fraudulent. Now it may be that there was some value to the services that she provided. And so Medicare would have paid if it if it had been built properly, but it was not built properly. And so that's why it's okay. That makes a lot of sense to me. Why would that not be true then for the restitution? And why is the 10% even allowed off at all? If all the bills were fraud because it was built to the doctor as because the testimony as I understand it is by building it to the doctor, you get 15% more reimbursement than if you build into the P. A. So why is it not all fraud? I think the district court could have reasonably declined to discount the restitution amounts by saying that Medicare places no value on services that are built incorrectly. But I think it's also reasonable for the district court to say if this had not been built fraudulently, if it had been built properly, Medicare would have put some value on it. And so I'm going to discount the loss to Medicare by that amount was offset. My last question on this issue was their testimony from the was her testimony for him that if Medicare knew that the doctor was not providing the services that the P. A. Was even if it was a legit service, they would not have paid. In other words, who who is providing the services just as material as anything else? Um, yes, I I'm not sure that he specifically put it that way, but there was certainly testimony evidence in the record, and I know we've cited in our brief, and I it was going to take me too long to put my finger on it right the second. Um, but there was certainly testimony that Medicare places no value on services that are improperly built and, in fact, can claw back money when it finds out that services have been improperly built. Let's see if that's all I have. Thank you. Let me let me ask you one thing. Council about that isn't under our uh decisions, or at least the way the decisions have been made in other circuits in the issue on forfeiture, where you're trying to take from the defendant the profits not to reimburse the victim of the government to take the profit. That is correct. Your honor isn't the rule that has developed that if the legitimate services amount mhm would have been reimbursed even without the fraud that you deduct that amount. It's a question of tracing. And haven't we said there's a but for test? Would he have been paid for the legitimate services if it hadn't been for the illegitimate billing the fraudulent bill right? Isn't that the test? I mean, that's correct. Your honor in the restitution context. So the question is no, no, no, no forfeiture. I'm sorry. So in in forfeiture, the question is, would um, would the defendant have obtained this money without the fraud? And the answer is clearly yes. Is it not? Mhm. The answer is yes, that he would have received money from Medicare, but for the fraud. I'm not sure that that is correct. No. Well, more importantly, I'm sure the district court didn't address that issue, did it? It didn't. All right, let's have now. Let's include in this hearing on forfeiture whether he would have gotten this money but for the fraud. I couldn't see anything in the order or the hearing or anything else that the district court touched on that. Am I wrong? Well, it's I believe it is. The requirement is that the gross proceeds of the fraud be forfeited. And I think it's fairly clear that the gross proceeds of the and Medicare places, but gross proceeds, the gross proceeds of the fraud not include the proceeds of the legitimate services. It is gross and net. Uh, it's a profit. Get back to profit, Mr Garland. It's a profit term. You take the proceeds, you deduct cost expenses, all that kind of and you get that proceed. But that's not what forfeiture is talking about. Forfeiture is talking about the proceeds that he would have not have gotten. But for the fall, right? So I think that you're I think maybe you are making a distinction between money that he received as a result of lying versus would he have received other money if he had not lied? And I'm not aware of any case law that says that in a health care fraud case under the health care fraud statutes that the defendant only forfeits the money that he received from Medicare that he would not have received if he had not lied. I don't believe the answer is part of the answer that because as Judge Carnes correctly framed it, it's but for the fraud where they have received it. It's but for test. So isn't the answer that all of it is fraud? 100% is fraud because the entire scheme, even if services were provided, they were billed to the doctor when the doctor did not actually provide those services, right? That's correct. Your honor. In other words, all of it was traceable to the fraud. All of it is traceable to the fraud. That's even exactly right. In other words, from Medicare's perspective, even if I went in there and I actually changed someone's bed and and checked on them to make sure they were alive, that's legitimate services. But if they build it to doctor, so and so, that would be fraud because even though a service was provided, the doctor was paid a lot more money for that service. Right. That was true. And all the money was 100% of the bills, right? That's correct. If you if you lie on a Medicare bill, the entire amount of the bill is the gross proceeds of your fraud. That's right. Well, it depends. If you're talking about a but for test, if you had not at me but for the fraud, you wouldn't have gotten anything and but for the fraud, he would have gotten something. No, but for the but for the fraud, he wouldn't have gotten it. Wow. Yeah, I understand. I understand. That's that's why you do the adjustment. The traceable adjustment. I fall. No, your honor. The traceable question is from what you want to do is take from this criminal the amount he got because he committed crimes. And the way I thought it was settled that you did that is you take the legitimate services that he actually rendered that that didn't enrich him more than he was entitled to be enriched. And you deduct those from the enrichment that he got because of his crime and make him forfeit the fruits of crime. Not you. I didn't think you were aiming here at punishing in addition to the fact you've got imprisonment, you got fine so forth. But when it comes time to forfeiture, what you want to do is take the enrichment he got because of his crime. Am I wrong about that? So you're so your honor, you're not wrong when you say you take the enrichment he got because of his crime. I think where the enrichment that he got because of his crime is the entire amount that he was paid by Medicare and by Medicaid. That wasn't a but if amount if he but if he had not billed at his rate as opposed to the assistance right, he would have gotten 85% of the amount he did. And he did that 85% but crime. He got the 15 added on percent. So as a factual matter, that's not accurate, Your Honor, because the vast majority of these services were had absolutely no value whatsoever because they were simply not medically necessary. So he would not have gotten 85%. But I understand that. And that's what the district court is supposed to focus on and make a reasonable estimate about. That's correct for restitution and for intended loss, but not for forfeiture. I would note the health care forfeiture statute does not allow a credit for lawful services rendered. Other statutes do. The health care fraud statute does not. I think you have to view that as as intentional by Congress that what Congress intended with the health care residue forfeiture statute is that if you lie to Medicare in order to get paid, you have to forfeit the entire amount that Medicare paid to you. That's the law. I'm not aware of a single case and defendant hasn't cited a single case that says that you get an offset for services that you would have been paid for if you had not lied about them. And the statute doesn't contemplate that the statute contemplates that in other forfeiture settings, but not in health care. This statute reversed a gross proceeds, right? Yes, that's correct, Your Honor. And and it is traceable. If it is, if it is traced to a bill that was the subject of the fraud, I think the district court here reasonably found that all of the bills that Dr Moss submitted were traceable to fraud because he lied on all of them. Mhm. Well, that's that's a traceable. That's a traceable issue. And I'm not sure the district court's right about that. What I'm what I am more interested in finding out and I'll do it myself is whether health care is different from all of the forfeitures as you say it is. And it may well be. But I didn't pick that up. I didn't realize that was your argument in brief. It's your argument now and that's good enough for me. You're on a that's our argument in the brief. We know in our brief that the health care fraud statute doesn't allow an offset for lawful services. That's what the Bikundi case from the D. C. Circuit explains. Yeah, we've got a lot of different language in different forfeiture statutes. That's correct. Your honor. This is a 982 88 a seven. Uh and it refers to gross proceeds. You've got in some context 981 a one C. It refers to proceeds. It's gross receipts under 981 a one D through E. It's gross proceeds and others. I mean the statutes have all kinds of different terminology. But this is 982 a seven right? That's I believe that's correct. Your honor. Yes. And I think the the Bikundi case sets this out. Okay. Any other questions of this test here? Um she she did not. Uh we didn't have any questions for you about Mr Garland's arguments. Um I'm not sure that you need to say anything about that. But um if you have anything further, I'll give you a minute. Um thank you. Your honor. I would just note um that I think the district court did not abuse its discretion in any of the evidentiary rulings or in the exercising its discretion to limit closing argument. I would say even if there were some error, the evidence against the defendant here was just simply overwhelming. And so any error would have been harmless beyond a reasonable doubt. Um given the overwhelming evidence against the defendant. Um and if there are no more questions, I'm well over my time. So we will rest on our briefs. Well, you were on our time because we had a lot of questions, technical questions for you and Mr Garland's probably going to be given extra time to um uh to the extent he needs it to address those kinds of questions, many of which uh were beyond the scope of his opening arguments. Thank you Mr Garland. Thank you, your honor. Um turning to you know the issue of why bill more than medicare allows. There are plenty of other reasons for that other than intent to receive up to the build amount. For instance, one reason would be someone builds an amount for both private insurance and medicare where the reimbursement rates would be different. And so you would want to keep the same building structure for both knowing you're only going to be reimbursed at any evidence though that your client actually intended to receive less than the build amount. And I understand that he knew that about the reimbursement rates and he would have also known that the reimbursement rates can increase and he could be received, he could be paid up to the build amount in the event that there was an increase in the reimbursement rate after after he built the government. But is there any evidence that other than his knowledge of reimbursement rates that he actually intended to receive only the reimbursement rates? Your honor, there is no direct evidence that dr moss told me his intent in submitting this bill was to receive the reimbursement rate. But there's no, there's also not the sort of thing that she had in what was the case? Um Yeah. Moran case where there's any kind of internal documents that show that that his intent was only to get some lesser amount. Yes. I don't believe there's a document like that your honor. But certainly Moran doesn't set that out as a necessary condition. I'm not saying that. I'm not saying that. I just wanted to know what we have here. And your honor, I would, I would ask you to focus though on the evidence, the extensive evidence the government put in of his knowledge of the billing rates to have that knowledge and then engage in the steps of billing is all the proof we need to show that he intended to receive the reimbursement rates. It's just like any other case you assault case where you know the act you're doing is dangerous and then you do it, you're guilty of the underlying crime. This is the same type of thing. He was so aware of what the reimbursement rates was to submit a bill in and of itself is proof that he intended to receive the rates that were allowed because he knew all that would he would receive would be the rates that were allowed. He knew that that might be all we need. But if the reimbursement rates can change even more than annually and that you would receive in that event up to the amount billed or reimbursed or the new reimbursement rate, whichever is greater, then the record also allows an inference that he would have wanted at least the amount he built, right? I don't agree, Your Honor, because there's no evidence in the record to show that the rates ever increased up to the level of the build amount. There's no evidence of that at all. At the most, there would be an increase between the difference of the current rate and the new rate. And that still does not get your honor all the way up to the build amount. It only gets you this marginal increase depends on what the new reimbursement rate is, doesn't it? But there's no, there's no evidence there's that you wouldn't be paid more than the build amount, would you? Correct, Your Honor. Um, but there's no evidence whatsoever in the record, Your Honor, that the rates ever increased on on that nature that the billings were many times higher than the reimbursement rates. I would submit for to be in line with the private insurance billing and there's no evidence they ever increased up to the bill rates. Not the government didn't put in one piece of evidence to show on this occasion the reimbursement rate increased to at or above the build rates and to say that that might be enough is is mere speculation. So you think that mere knowledge is enough to require the district court? It would be clearly erroneous for the district court to have found that the presumption had not been rebutted. Yes. I mean, whether it's through just judicial notice or the evidence presented at trial, that it was overwhelming knowledge of the rates and and billing those rates that absolutely the presumptions is rebutted. Um, turning to the court's discount of 10% that 10% was based on the testimony of Sean Taiwan's one comment from Sean Taiwan. It's not based on any meaningful assessment of the evidence showing what services provide. My testimony was that 95% of the visits were medically unnecessary, right? Your honor, I may be misremembering the testimony. I don't have it in front of me. I think you're both right. I think he testified 90 up to 95%. But I think the district court probably just let's be careful. Double that got 10%. Right. And, you know, we also, as pointed out, we have to include the services of the nurse practitioner. We have to include, you know, we put forth extensive evidence at sentencing about all the other necessary services that would be required to keep these people alive, to keep them cared for, to keep, you know, we put in the evidence that their life counsel with regard to that there was contrary evidence. And I understand that you put in the evidence that this would have had to have happened or could have happened. But there was evidence that 95% was illegitimate. The district court clearly tacked on some extra because of the nurse practitioner, um, and rounded out. And as I understand the guidelines, all that's required is a reasonable estimation when you do this. So I just it's hard for me to see that that's clear error, even where there's contrary evidence. If you could focus on on the forfeiture issue, as I understand the government's argument, the reason why all bills are traceable to the fraud is because that all bills were made to Dr Moss and Dr Moss in all services. Is that fair? I believe that's what the government's are. Yes, you're right. Then why would why is that wrong? That it would not all be traceable then to the fraud. If the fraud is defined, as I understand it to be that part or at least a big part of the fraud was that you build to a person who did not provide that service. That is a material fact, and it led to a higher reimbursement rate. But, Your Honor, I would submit that the value of these legitimate services have to be accounted for because they don't go to any type of core conspiracy here. They are services that are being provided for these patients. But if Medicare, if Medicare determines it to be material on who provides the service and the service is not provided by that person, then what does it you know, check to make sure that the oxygen levels were appropriate? What does it matter if if the wrong person is doing it and Medicare is billing based on that material information? Well, I would say, Your Honor, if that were the rule, then that if that were the exception, that exception would swallow the whole because there would never be an analysis of what services were provided because in every Medicare fraud case, isn't this the isn't this the statute and how it's worded the court and imposing sentence on a person convicted of a health federal health care offense shall order the person to forfeit property real or personal that constitutes or is derived directly or indirectly from gross proceeds traceable to the commission of the offense. I don't understand how it is that, um, that that that's not satisfied here. Your Honor, because it doesn't account for the legitimate services that were provided. It says gross proceeds traceable to the commission of the offense. And I would submit that proceeds that would would were obtained for legitimate services are not traceable to the commission of the offense. But how can the services be legitimate if if they were billed to a doctor who did not provide those services? And everyone agrees, at least there's some evidence that 100% of the bills were made to a doctor who did not provide the service. It can't be legitimate, right? The who it was billed under was not correct. It was incorrect billing, but the services themselves were very much legitimate. That's what I said. What does it matter? I mean, what if they hired the janitor to do what the doctor allegedly have done? What does it matter? That's not something you can bill for under Medicare, Your Honor. What the services were rendered were very much billable and reimbursable under Medicare and legitimate services. You have to these patients receive great care. Witnesses were put up to testify to that care. There was testimony that the life expectancies of the people was extended. I'm not going to get in that with you because that is those are just very much disputed issues. But at least with regard to this, when we're talking about traceability, it seems to me that 100% of the bills were traceable to what the alleged fraud was. Because remember, it's traceable gross proceeds traceable to the offense. If the offense here is billing for the doctor who did not actually provide those services, then it would seem to me that 100% is traceable to that. And I understand your position, Your Honor. I would say that there is a carve out for the legitimate portion of that because it is not part of the conspiracy to provide the legitimate services. It all depends on the definition of traceable. Does it? Yes, Your Honor. And I thought there was a butt far test, but then I guess it all and maybe what the offense means. Um, what was where the gross proceeds for a particular fraudulent billing? He said he did it. He got 85% uh, instead of the other or he got 15 more percent. He said, I did this. And in fact, he did. Is the 85% of that traceable to the commission of the offense? Or is the gross proceeds the entire 100% of that one billing traceable to the commission of the offense? That's I agree with you, Robin. He said he submitted a bill and he gets and he gets the amount right. But for that bill, he wouldn't have been paid that amount. It grows them out, right? Yes, Your Honor. But I would submit that the analysis is not that simple because that's the way I thought. But forward, you know, I've had debates with colleagues about but for before. Yes, it is one of those, uh, terms that is subject to different interpretations. Absolutely, Your Honor. And I would submit, as I've stated, that it does not include those legitimate services that would have been billed properly under Medicare. I think we understand your argument. Council. We've gone a fair amount over. There are a lot of issues in this case and particularly some complicated guideline and other sensing issues. And, um, we very much appreciate your help this morning. We'll be in recess until tomorrow. Thank you, Your Honors. Thank you, Your Honor. Thank you.